IRVING, J.,
for the Court.
¶ 1. James H. Guyton was convicted by the Lee County Circuit Court of one count *723 of burglary and two counts of armed robbery. He was sentenced to serve twenty years on the burglary count and twenty-five years on each of the armed robbery counts in the custody of the Mississippi Department of Corrections, with the sentences to run consecutively. Aggrieved, Guyton appeals his conviction and argues: (1) that the trial court erred in denying his motions for a directed verdict, (2) that the trial court erred in denying his motion for a judgment notwithstanding the verdict, and (3) that the trial court erred in denying his motion for a mistrial.
¶ 2. Finding no error, we affirm.
FACTS
¶ 3. On the morning of March 3, 2005, Brandi Johnson was in her South Park Manor apartment located in Tupelo, Mississippi. She, her eight-year-old son, Aly-jiawon Johnson; her boyfriend, Parish Neely; and Neely’s three-year-old niece were preparing to go out when two armed men entered her bedroom demanding money.
¶ 4. Neely recognized one of the robbers as McGaughy, who subsequently implicated Guyton as the second robber.[1] Guyton and McGaughy were jointly indicted for the robbery. At Guyton’s trial, seven witnesses testified for the State: Brandi, Aly-jiawon, Neely, Renetha Gardner, Detective Randy Tutor, Detective Rick Rogers, and McGaughy. In order to give clarity to our analysis and holding, we will summarize each witness’s testimony.
¶ 5. Brandi testified that she was in her bedroom when the men entered the room and one of them forced her and Neely’s niece, at gunpoint, to go into the living room and to lie face down on the floor. Brandi described this gunman as a “bright skinned” African American about six foot two inches tall. She stated that he wore a hood and a black T-shirt, and that he carried a black revolver. Brandi also testified that during this time the second gunman, whom she described as an African American male about five feet seven inches tall with a “caramel complexion,” escorted Neely around the apartment searching for items to steal. She stated that the second gunman wore a blue shirt and a blue stocking cap over his face and that he carried a silver revolver. After the second gunman had taken what he wanted from the apartment, he forced Neely to lie on the floor. Both gunmen then escorted Brandi and Neely’s niece back to the bedroom and instructed them to lie on the bed and not to move. Additionally, one of the gunmen threatened to kill them if they disobeyed his order.
¶ 6. Alyjiawon testified that he was in his room listening to his compact disc player when the gunmen entered the apartment. Like his mother, Alyjiawon testified that one of the men wore a stocking cap over his head and the other wore a hood. Although he could not identify the gunman who wore the stocking cap over his face, Alyjiawon stated that it was that gunman who took his mother’s cellular telephone. Alyjiawon also stated that this same gunman told him to “shut the ‘F’ up.”
¶ 7. Neely testified that as he approached Johnson’s apartment, six men were hanging around the steps near the apartment, and as he entered the door to Brandi’s apartment, two men stepped in and told him to “drop it off.” Neely’s description of the gunmen was similar to Brandi and Alyjiawon’s, but he also stated that the taller gunman had a gap between his teeth. Neely stated that he was able to identify this gunman as McGaughy because McGaughy had been a frequent visi *724 tor at Neely’s home. Nevertheless, out of fear for his safety and for the safety of the others in the apartment, Neely did not let on that he knew who McGaughy was. Neely testified that McGaughy led him around the apartment at gunpoint, and that McGaughy took his cellular telephone and two hundred and fifty dollars.
¶ 8. Further, Neely stated that after the gunmen left the apartment, he, Brandi, Alyjiawon, and his niece left the apartment and went to Brandi’s mother’s house, which was about five minutes away, to call the police.[2] Neely gave the police a description of the gunmen and the guns used in the robbery. Neely also testified that he spoke with McGaughy after Neely had given his statement to police and that McGaughy admitted that he and another gunman, whom McGaughy mentioned by name, committed the robbery.
¶ 9. On cross-examination, Neely testified that he knew on the day of the robbery that Guyton was the other gunman because he had seen him before. Neely further testified that he only knew Guy-ton’s first name and that he later learned Guyton’s last name from Brandi who had attended school with Guyton. Neely also stated that Guyton was one of the men sitting on the steps as he approached the apartment. However, Neely admitted that he did not include in his statement to police that the gunman wearing the blue stocking cap over his face was Guyton. On redirect, Neely stated that during his conversation with McGaughy, McGaughy revealed to him that Guyton was the second gunman. Neely also testified that McGaughy told him Guyton forced him to commit the robbery by putting a gun to his head.
¶ 10. Tutor, a detective with the Tupelo Police Department, acted as the lead investigator. He testified that he concluded that McGaughy was one of the gunmen based on his prior dealings with McGau-ghy and the descriptions given by Brandi, Neely, and Alyjiawon. Tutor presented a photo lineup to Brandi, Neely, and Alyjia-won. Alyjiawon identified McGaughy'as the gunman who wore the hood during the robbery. Tutor took statements from the victims and verified that two cellular telephones and two hundred and fifty dollars were stolen during the robbery. The officers wanted to apprehend McGaughy as quickly as possible, so a description of the crime along with McGaughy’s picture was featured on the local Crime Stoppers program which aired on the night of the robbery.
¶ 11. Following the Crime Stoppers special, the officers received information that McGaughy and Guyton were staying at a Hampton Inn. The officers went to the Hampton Inn with an arrest warrant for McGaughy. When the officers entered McGaughy’s room, they noticed two cellular telephones, matching the description given by Brandi and Neely, in plain view. The officers arrested McGaughy and took him into custody. Shortly thereafter, McGaughy gave a statement to police which led to Guyton’s arrest.
¶ 12. On cross-examination, Tutor testified that no lineup was conducted of Guy-ton and that McGaughy was the only person who positively identified Guyton as the second gunman. He also testified that the pistols used in the crime had not been located. Tutor further testified that McGaughy failed to appear in court for a previous court date in this case and that as a result a warrant was issued for his arrest.
*725 ¶ 13. At the Hampton Inn, the officers learned that Gardner, an employee of the Hampton Inn and Guyton’s girlfriend at the time, had rented two rooms in her name the night before for two individuals, one of whom was McGaughy. Thereafter, the officers obtained Gardner’s consent to search her apartment. The search revealed a blue stocking cap, which all three victims identified as the stocking cap worn by the second gunman. Rogers, one of the officers who conducted the search, stated that upon opening the door to Gardner’s apartment they noticed the stocking cap and a long-sleeve blue T-shirt lying in plain view on the couch.
¶ 14. Gardner testified that McGaughy and Guyton were in her apartment when she returned home from working at the Hampton Inn. Gardner stated that she noticed a light blue stocking cap and a blue shirt which belonged to Guyton lying on her couch. Gardner also stated that there was a bag containing McGaughy’s clothing in her living room. Gardner further testified that Guyton is a light-complected African American male about five feet seven inches tall and that Guyton is the only person meeting this description that had a key to her apartment.
¶ 15. On cross-examination, Gardner stated that on the day of the robbery, McGaughy and Guyton asked her to drive them to a dumpster at the South Park Manor apartment complex. She stated that Guyton then retrieved a bag containing the clothing which he brought back to her apartment. The threesome then went to the Hampton Inn, and she rented McGaughy and Guyton two rooms. Gardner stated that she did not stay overnight at the hotel but that Guyton was still at the hotel when she returned the following morning.
¶ 16. McGaughy testified that at the time the crime occurred he lived at the South Park Manor apartment complex with a friend. He stated that he and Fleming Gray[3] were among the men hanging around outside at the apartment complex. According to McGaughy, when Neely walked by Gray commented that Neely probably had some money. McGaughy testified that he and Guyton discussed breaking into the apartment to steal Neely’s money and valuables. McGaughy stated that Guyton provided the guns used in the robbery and that McGaughy used a silver handgun with a black handle to commit the crime.
¶ 17. McGaughy stated that the door to Brandi’s apartment had been left slightly open. He then knocked on the door and pushed it open when no one answered. McGaughy testified that he wore a gray hood over his head during the robbery and that Guyton wore a blue stocking cap. McGaughy stated that, after they forced their way into the apartment, Guyton ordered Neely to drop his money and ordered McGaughy to take the others to the front of the apartment. According to McGaughy, Guyton then escorted Neely around the apartment at gunpoint. McGaughy testified that Guyton also stole a pair of Brandi’s tennis shoes and her identification card before bringing Neely back to the front of the apartment.
¶ 18. McGaughy testified that he and Guyton left the apartment on foot and ran to a nearby store. McGaughy also testified that Gray and Gray’s girlfriend were waiting in Gardner’s car and that McGau-ghy and Guyton were taken to Gardner’s apartment. At some point thereafter, McGaughy learned that the police had been looking for him in connection with a burglary and robbery that had taken place *726 earlier that day. As a result, his clothes had been put in a dumpster at the South Park Manor apartment complex. When Gardner got home from work, she took McGaughy and Guyton to the South Park Manor Apartments so McGaughy could retrieve his clothing.
¶ 19. A little while later, Gardner dropped McGaughy and Guyton off at the Hampton Inn. McGaughy stated that Guy-ton left the Hampton Inn shortly before the police arrived the following morning. McGaughy admitted that he was involved in the crime; however, he initially told the officers that his accomplice was a man by the name of Leon.[4] McGaughy testified that he did not mention Guyton when he first spoke with the officers because he was afraid to implicate Guyton. However, McGaughy subsequently identified Guyton as his accomplice in his written statement and did not mention any person named Leon. He also stated that he did not mention Gray’s involvement to the police because Gray was not involved in the actual crime. McGaughy gave the same reason for failing to mention that Gray and Gray’s girlfriend were in the getaway car when McGaughy and Guyton arrived at the store. On cross-examination, McGaughy acknowledged for the first time that another unidentified female drove Gardner’s car from the store.
¶ 20. As for the stolen property, McGaughy testified that Gray and Guyton kept most of the money and gave him forty dollars and the stolen cellular telephones. McGaughy also said that Guyton initially told him that he could keep the smaller handgun, but then Guyton took the gun back and told him that he was going to bury it. McGaughy pleaded guilty on the morning of Guyton’s trial.
¶21. Guyton refused , to give a statement to police and did not testify.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Directed Verdict

¶ 22. Guyton complains that the trial court erred in failing to grant his motion for a directed verdict at the close of the State’s case-in-chief and at the close of his case-in-chief.
“In considering a motion for directed verdict, the reviewing court must consider evidence introduced in [a] light most favorable to [the] State, accepting all evidence introduced by the State as true, together with all reasonable inferences therefrom; if there is sufficient evidence to support a guilty verdict, [the] motion for directed verdict must be overruled.”
McKee v. State, 791 So.2d 804, 808(¶ 14) (Miss.2001) (citing Edwards v. State, 615 So.2d 590, 594 (Miss.1993)).
¶ 23. After reviewing the record in this case, we find that the evidence was sufficient to sustain Guyton’s burglary and armed robbery convictions. Burglary is defined as the breaking and entering of the dwelling house of another with the intent to commit a crime therein. Miss. Code Ann. § 97-17-23 (Rev.2006). The evidence is clear that Guyton unlawfully entered Brandi’s apartment with the intent to rob Neely. Mississippi Code Annotated section 97-3-79 (Rev.2006) provides in part:
Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by vio *727 lence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery....
¶ 24. Although the victims could not positively identify Guyton as the second gunman, they were able to provide the police with a description of the perpetrator, the stocking cap used by the perpetrator to disguise his identity, the type of clothing worn by the perpetrator, and the type of gun used in the crime. Additionally, the blue stocking cap and blue shirt matching the description given by the victims were found in Gardner’s apartment, Guyton’s girlfriend at the time of the crime. The evidence, including Gardner’s testimony that McGaughy and Guyton were at her apartment when she returned from work on the day of the crime and Gardner’s assertion that no one else matching Guyton’s description had a key to her apartment, clearly indicates that a reasonable jury could have found Guyton guilty beyond a reasonable doubt.

2. Judgment Notwithstanding the Verdict

¶25. “Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal.” Gibson v. State, 731 So.2d 1087, 1092(¶ 11) (Miss.1998) (quoting Pleasant v. State, 701 So.2d 799, 802(¶ 12) (Miss.1997)).
¶ 26. Allowing the jury verdict to stand would not sanction an unconscionable injustice. Guyton contends that “McGaughy’s testimony is incredible and should not be believed.” Despite the fact that McGaughy was hesitant to initially name Guyton as his accomplice, the jury apparently still found his testimony credible. Guyton argues that McGaughy’s testimony was not credible because he pleaded guilty “with hopes of leniency in exchange for providing incredible testimony against [Guyton].” It is well established that “[i]t is ... within the province of the jury to determine the credibility of witnesses.... ” Pleasant, 701 So.2d at 802(¶ 13) (citing Groseclose v. State, 440 So.2d 297, 300-01 (Miss.1983)). Moreover, the Mississippi Supreme Court has held that “the jury may believe or disbelieve, accept or reject the utterances of any witness.” Banks v. State, 782 So.2d 1237, 1243(¶ 26) (Miss.2001).
¶ 27. Guyton also argues that McGau-ghy was the only witness who implicated him in the crime. However, Neely also identified Guyton as the second gunman. Even though the defense pointed out that Neely did not mention in his statement to police following the crime that Guyton was the second gunman, the jury apparently still found him credible.
¶ 28. Finally, Guyton contends that the only physical evidence against him is the blue stocking cap and T-shirt found in Gardner’s apartment. Specifically, Guyton claims that “there has been no proof that [he] wore those items of clothing in any crime.” This statement is not entirely true. As previously stated, the stocking cap and T-shirt were found in Gardner’s apartment, and the victims stated that the second gunman wore items identical to them during the crime. Therefore, it is logical to conclude that the items found in Gardner’s apartment shortly after the crime belonged to Guyton, who had a key to her apartment. We cannot agree with Guyton that because McGaughy admitted to owning the bag of clothing found in Gardner’s apartment, any other clothing found in Gardner’s apartment which did not belong to Gardner must also belong to McGaughy. Considering all of the evidence, we find that allowing the verdict to *728 stand would not “sanction an unconscionable injustice.”

3. Denial of Motion for Mistrial

¶ 29. Guyton argues that the trial court committed reversible error in denying his motion for a mistrial. Guyton objected and moved for a mistrial immediately after McGaughy testified that he initially told the officers that a man named Leon was his accomplice in the crime. Guyton argues that the State violated the rules of discovery by failing to inform him of this information and of the fact that Gray, Gray’s girlfriend, and another unidentified female were in the getaway car. The State responded by saying that the file did not contain any information regarding an oral identification of Leon given to police by McGau-ghy, nor did it contain any information indicating that other people were in the getaway car. The State also noted that this information did not come out in any pretrial interview. Guyton’s attorney argued that the information was exculpatory and should have been available to the defense. The trial judge responded:
Assuming that it is in fact exculpatory, it certainly should have been produced. The witness has indicated that he was making up a story, and that never got very far. He named a name Leon that he in his sworn testimony says there was no such person, that it was the defendant at all times. And while I suppose ideally the defendant should have even this kind of information, it does not rise to the occasion in giving the defendant [Guyton] an out or cause for a mistrial in this case.
[[Image here]]
If you pursued this thing, he would tell you on every occasion that Leon was fictitious period. As to the credibility of it, I think the jury can determine what weight and worth conflicting statements, which are I think well before the jury, but as far as this leading to anything, I fail to see where that would be of any significance at all.
¶ 30. In Brent v. State, 632 So.2d 936, 941 (Miss.1994), the Mississippi Supreme Court held that “the decision to declare a mistrial is within the sound discretion of the trial judge.” We find no error in the trial judge’s decision; thus, this issue is without merit.
¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY OF CONVICTION OF ONE COUNT OF BURGLARY AND SENTENCE OF TWENTY YEARS AND CONVICTION OF TWO COUNTS OF ARMED ROBBERY AND SENTENCE OF TWENTY-FIVE YEARS ON EACH COUNT, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH THE SENTENCES TO RUN CONSECUTIVELY, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LEE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.

. McGaughy’s first name is Germni, but he is generally referred to as Jeremy.

. Neely testified that he could not call the police from Brandi’s apartment because the gunmen had stolen Brandi's and Neely’s cellular telephones.

. McGaughy testified that Gray is also referred to as Anthony Gray.

. McGaughy testified on cross-examination that Leon was one of the men who was hanging around the apartment complex immediately before the robbery. He also stated that he could not remember Leon’s last name.